In the order I have, this doesn't mean anything. You can go in whichever order you want. I have Mr. Capdeville first, but clearly not Mr. Capdeville. Can you switch? You're much too short to be Mr. Capdeville. Good morning, Your Honor. This is Andrew Capdeville. Good morning. Did you mean to go first? Did you mean to go first? That's just the order on the minutes sheet. That's what happened when we heard you announce the name of the case. Okay. All right. May it please the Court, again, my name is Andrew Capdeville. I represent the appellant Lyle Benjamin. I'm very pleased that this is a tender-loving panel today. To quote Elvis Presley, I hope you will love me tender, as they say. Judge, I think I'll briefly sufficiently allocute our position for Mr. Benjamin. Importantly, we believe that the restriction on cross-examination at trial was unduly burdensome and prejudicial. I don't get that at all. I don't, frankly, understand why the judge didn't allow you to specifically ask about the maximum being life imprisonment. But he did say that you could say that it was, I think the word was terrible or severe. I don't know what was going on there. But how was that a denial of the right to cross-examine? The jury clearly gets the fact that this guy has a real motive to lie. Does it matter if the maximum in terms of the jury's eyes is terrible or it's life imprisonment? They may even have thought it was the death penalty he was facing. No, but if I had asked a question like, you're probably going to die in jail if you don't make a plea bargain, I think that would be more effective because that shows that his life was on the line. But more importantly, Mr. Bruce had already been sentenced at the time of our trial. He had 44 months, which arguably, if that had come out, would not have had the effect that we wanted. But importantly, it was a finite sentence. There was nothing speculative about that. And I believe we should have had that latitude. But maybe you caught a break because 44 months, I mean, I don't have to do the time, obviously. It's under four years. 44 months is not, is it 44? 44 months and five years. And that's not what I would consider a terrible sentence, especially the kind of time given out in federal court. That is not a heavy hit. The latitude the judge allowed you allowed you to suggest to the jury that the witness was really under an incredibly heavy exposure, much more than 44 months. That is correct. In fact, the impression was that he would have faced similar charges that Mr. Benjamin had, which was exposing him to sentence from 10 years to life. So that's why we felt that letting the jury know that we're talking about a substantial period of one's life in jail would have had a tremendous impact on his ability and his credibility to testify. We also argued that the evidence at trial was insufficient to support the conviction for conspiracy. Mr. Benjamin's role, when all is stripped, was simply that he allegedly recruited Mr. Bruce to transport drugs to the United States from St. Thomas. There was no evidence that Mr. Benjamin was in possession, and I understand that, you know, as a co-conspirator, you're liable for all the other acts that other co-conspirators may do. But knowing that this Court looks at the evidence for legal problems as opposed to factual determinations, my hands are greatly tied today. Suffice to say that this evidence was extremely weak. It boils down to Mr. Bruce, the co-conspirator, providing most of the evidence, if not all the evidence, against Mr. Benjamin. And we felt that his credibility was sufficiently attacked. But be that as it may, we understand that your hands are somewhat tied. I want to also mention about the oblique outside references to unadjudicated and uncharged crimes. Mr. Benjamin was alleged to have said on this tape, recording that he had sent 45 of something to Atlanta days before the October 22, 2011, act in this case. We had asked the Court to exclude that because we felt that it was extremely prejudicial. And while the judge felt that it was a statement in furtherance of his conspiracy, we begged to differ with that. Even one of the agents testified that he did not believe that Mr. Benjamin had sent 45 of anything to the states prior to this incident. So we believe that once the jury heard that, you can almost see the veil come over their eyes, that they felt that my defendant was guilty. We also believe that Mr. Benjamin was prejudiced by not being able to contemporaneously cross-examine the government's star witness, Mr. Bruce. As you've already said. But you can see that I'm not a big fan of the limitation in the Jennings Act. But the Court here did his actions were consistent with the law in terms of entitled to the witness's testimony after the witness testifies. That's true. Exactly. And I can only imagine had I been in that position and I was supposed to provide the government with some information after a witness testified and I did not have it, that witness would have been precluded or that testimony would have been stricken. And we felt under the circumstances, in fairness, that's what should have taken place here instead of us sitting now for what Judge Gomez did is he took a couple more witnesses and then we went to the next trial date, which was two days later, to continue to start the cross-examination. As we argued in our briefs, we just felt that that was prejudicial. It gave the jury that impression that what this guy was saying was gospel. And then when we came up, you know, Mr. Bruce is all fresh, clothes, and it's like, you know, we're starting at a disadvantage. Wasn't there an illness issue or dialysis issue? That was dealing with one of the defendants, Mr. Samuel. But I do not believe that. Oh, I'm sorry. That's why we had every other day. That is correct. Isn't that why you had the extra? That is correct, Your Honor. We also want to indicate that the extrajudicial statements that Mr. Benjamin made when he was arrested by the FBI, words to the effect, what took you so long? I was expecting you. I have to tell you that, yes, that is prejudicial, but it doesn't say that Mr. Benjamin is admitting guilt in this particular crime, and it doesn't show that he was thinking in terms that he had a consciousness of guilt here. And we just felt that that also was extremely prejudicial to his case. Let me tell you that. You argue that to the jury. I chuckled again, but I couldn't help but chuckle in the breeze when I read the guy's arrest and his response is, geez, what the hell took you so long to catch me? You can argue he was talking about something else, and the jury didn't buy it. We tried. So didn't he. I am sorry. In any event, the other arguments that we raised, such as the chain of custody, I certainly understand, and I want to point out also that we did get Judge Gomez's final memorandum decision, unfortunately, after we had briefed the issues here. In any event, we would ask the Court, after considering all the arguments in the law, to grant a new trial to Mr. Benjamin. I believe justice under the circumstances would require that. Thank you very much. Thank you, Mr. Judge. Mr. Hodge. Good morning, Your Honor. Good morning. George Hodge for Michael Samuels. My arguments really boil down to two main issues. Now, the Court stated – I would like to reserve three minutes of my time, please. The Court stated that the government had an obligation to provide a transcript after the witness testified. Well, yes, that is true, but what is implicit in that rule is that the government is expected to act in good faith. And clearly, there was bad faith where the government informed us on the day of jury selection that Mr. Bruce's transcript will not be available because of errors. Corrections had to be made. He didn't say errors. He said corrections had to be made to the transcript,  To this date, we don't know if it was typographical errors or whether there was a change in testimony. But we had – well, I should say Samuels had continuously objected to Mr. Bruce taking the stand, knowing full well, and the government knowing full well, that there will be no transcript to cross-examine him. He took the stand, and the government knew that we will have no opportunity until 48 hours later. So, in our – But at the time he took the stand, they didn't know that. I assumed from what happened, from reading the briefs, that the request was made for an opportunity to examine the transcript. It was then revealed that one of the defendants had an illness. They couldn't go to trial the very next day, so there was an intervening trial day. But I'm not sure it really matters. But I'm not sure at the time he took the stand anyone was aware of that, that it would be a two-day delay there or a one-day delay there. Well, the trial began, for example, on Thursday. And because my client, Michael Samuels, who had to have dialysis every other day, was due to then have his dialysis this Saturday, this trial began on Thursday, and then it continued to Saturday. So the government knew full well that once Bruce took the stand, we wouldn't have any opportunity to effectively undo whatever he might have done on Thursday until Saturday. But now this gives the jury an opportunity to really digest and really absorb all the things that Mr. Bruce has stated. Mr. Hodge, you used the term a few minutes ago, bad faith, on the part of the government. Am I correct? Yes, yes. I call it bad faith. Have you previously argued bad faith? I mean, that's a serious charge. Was that argument made in your brief or previously? I don't recall if I used those exact words. I don't recall saying either. But I believe, is it implicit in what I'm saying? If you haven't made the argument before, then clearly it's waived. And I'm just saying that if that's the case, it would be waived. Assuming that that issue is waived, what do you have here other than the plain language of the act? Well, we began by explaining in our opening statement to the jury that the only witness, the only evidence connecting Samuels to this case is Bruce, his brother-in-law. There's no evidence tying him to the other defendants. When the court allowed Bruce to give his testimony and step off the stand, of course now the jury is puzzled. All these things you said in the opening argument, well, you don't even cross-examine him on anything. Yeah, but the court couldn't prevent him from taking the stand under the law prior to the Jinx Act material being disclosed, because that's not what the Jinx Act says. But the court had the discretion to postpone him going on the stand until his transcript is available. The court could have done that, but the Jinx Act clearly does not. I tend to agree with you, frankly. I think that's a better way to proceed, but you and I are both wrong under the eyes of Congress. That's not what the court is required to do. Well, as a matter of fundamental fairness, I ask for curative instruction to at least let the jury know that the reason why we're not cross-examining this crucial witness is not because we were blowing smoke in our opening statement, but because we didn't have the information, the transcript to cross-examine him on. And to this date, we still don't know the reason why his transcript was not available. Okay, but now you're talking abuse of discretion, which is a very different inquiry than the argument that what happened was a violation of the Sixth Amendment right to cross. You say Sixth Amendment. I think it was the Fifth Amendment, actually.  for a curative instruction, and the court said he was not going to give the curative instruction to the jury because it would raise a red flag against a government case. Now, the matter of fact that the court is concerned it will raise a red flag against a government case tells me that the court is not looking at the defendant's presumption of innocence. Why not give my client a green flag to continue on under the presumption of innocence not to raise some sort of red flag to the jury that something here is not right. It is not right to put someone up, let them speak as if they are speaking the gospel, and not have the defendant to viciously, aggressively cross-examine this witness. Because I should have, and we were denied the opportunity to do so. I do understand the argument. You guys have been on for a while, and you reserved some time, so we'll hear from you again. Thank you, Your Honor. Good morning. Darren Jean-Baptiste on behalf of Ben Marrero Jr. I would like to reserve three minutes for rebuttal. Okay. It's my position, and Your Honors will correct me if you don't agree, but I think that the government, in its brief, to the extent that the government indicates that the issue that I brought before the court is that I feel the court here in denying a motion to dismiss the indictment based on that. Have you ever seen a case where an indictment has been dismissed for the kind of error that you're alleging here, a grand jury indictment, for sufficiency of the evidence as opposed to prosecutorial misconduct or something of that sort, or speedy trial-like violation or something of that sort? Well, I don't characterize it as for sufficiency of the evidence. I think that the standard that the court applies here is the holding a mechanic. And I think that what we have here, a trial. I basically said to the court that the indictment in this case would not have issued but for the statements uttered by Agent Grossman. Those are the words that I used. There were two aspects to it. I'm sorry? There were two aspects, though, to the indictment. There was a superseding indictment. Yes. And that takes me to my opening statement that I think the government conceded that the violation here basically gave rise to the standard from Mechanicus. I'm sorry. You said in your brief that the issue is, but for Agent Grossman's misstatement to the grand jury, no indictment would have issued and the trial court erred when it failed to dismiss the indictment based upon the perjured testimony. It's really the same issue. You're talking about Grossman's grand jury testimony. Yes. Okay. The grand jury's decision to indict, the violation substantially influenced the grand jury's decision to indict. The government in their response brief basically says that the problem essentially was cured because there was a superseding indictment. However, He came back. Grossman came back and tried. The problem was whether or not, initially he said he went into the bathroom where the drugs were passed and he had the drugs in a backpack, but the video showed he didn't have a backpack. Yes, but it was even graver than that because you have to bear in mind that the grand jury specifically asked, what is Marrero's connection to the drugs in this case? And the government slapped the jurors on the wrist, not physically, but chastised them and said, you're not listening. Let's bring Agent Grossman back in here. And they brought Agent Grossman back in here. And unfortunately, what Agent Grossman offered the grand jurors was pure falsehoods. Nothing that Agent Grossman said with respect to what he observed after he. Well, you've actually, in your brief, used the word perjury, haven't you? No, I didn't use the word. You never used that word? No. I just read it. I'm sorry? I just read from your brief, the trial court, Eric Winterfield dismissed the indictment based upon the perjured testimony. It's on page 15 of your brief. I was pretty sure I had seen that word before in connection with this testimony. But where I'm going with this is, let's assume that the agent did not even come in at a subsequent time and correct or attempt to explain some inconsistency. Let's assume that didn't even happen here. I want to know how you overcome the strictures of Bank of Nova Scotia and mechanic, which, as I read them, suggests that once you've gone the trial route and have a verdict, that kind of defect back there in the course of an indictment of the grand jury proceeding become nil, null and void. I don't know if that's what mechanic stands for, because mechanic, we basically go back to, it says that the rule comes from the concurring opinion of Justice O'Connor. And one of the things that I read in the concurring opinion. Well, I mean, the Supreme Court's language in mechanic is that the pettit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation. But when I read the entire opinion, when I read Justice O'Connor's concurring opinion, one of the things that she said was that there was no per se rule based on the ultimate verdict. Like, basically, you're not going to say because the jury came back guilty, we're going to now invalidate or uphold around doing done by the government in this instance. I think that the fact that the government, in their response, the government says that the problem has been cured by the superseding indictment. But it's telling when you look at the, when the government went back to the grand jury for the second, for the superseding indictment, the government tells the jury, we're only here on a fourth. We're not adding anything. And then they put Grossman on the stand, and Grossman doesn't testify about the value of the drugs. Grossman now goes in and tries to correct the supposed misstatement that he made, the falsehoods that he made. And then Agent Grossman also adds in another misstatement. Agent Grossman suggests that the defendants, that Mr. Marrero, had access to a storage locker as a Port Authority employee. And I don't know if the court picked up on it, but at trial, one of the very last witnesses at trial was a supervisor of Mr. Ben Marrero. And she was asked a question by the government as to the storage locker. And we were able to get back up on redirect, and we asked her unequivocally whether or not these defendants had access to that storage locker. And she said unequivocally no. So whereas the government is saying that they corrected the violation of the wrong, when they brought Agent Grossman back, again they are for something that was not completely true to the grand jury. But I want to answer your question directly. You're saying to me that isn't it rendered a nullity because the jury came back with a guilty verdict. I don't think that's what it says. Because if that's the rule, then the government, in every instance, they can do what they can to avoid the defendants making a motion to dismiss at the very last minute. The court holds it under advisement, oftentimes until after the jury reaches their verdict. And then when the jury comes up with a guilty verdict, the defendant just has to walk away and accept it. We do understand your argument. You also reserve some time, I think, for rebuttal. Thank you. Thank you, Mr. Jean-Baptiste. Mr. Jones? Mr. Brooks? Good morning again. John Nelson Jones for the appellee in United States of America v. Leal Benjamin, Abner Moreira, and Michael Samuel. With respect to Mr. Leal Benjamin and the question concerning limitation on his cross-examination of Mr. Bruce concerning the plea agreement and his exposure, we submitted to the court that the court did not limit the cross-examination. What the court said was you can't get into a specific term of imprisonment when questioning Mr. Bruce. They gave the defendant wide latitude to question him concerning the terms of the agreement as far as what benefits he's to receive and the like. All they said was you cannot ask a specific question in terms of what sentence you receive. In fact, what the court told defense was that, and at sidebar, you can ask him whatever you want with respect to the fact that it's terrible, that it's overbearing, that he needs to tell the truth in order to have the plea agreement not be null and void, but you just cannot ask him a specific question. And that's with the sentence that had already been given. That's correct. The sentence had already been given in a court in Atlanta. Mr. Bruce was prosecuted in the District of Georgia, not in the Virgin Islands. With respect to the statement concerning the 45 kilos to Atlanta, that statement was made during the conspiracy. If you recall the testimony of Mr. Bruce, Mr. Bruce made two trips to Atlanta. He made one in the summer of 2011. He made the second one in October of 2011. The indictment charged from a period unknown to the grand jury through October 2011. The statement, the 45 kilos to Atlanta statement made by Mr. Benjamin, was made the week prior to the second trip by Mr. Bruce to Atlanta with the cocaine that he eventually was arrested for. So during the part of the conspiracy, the purpose of the 45 kilos to Atlanta comment was part of, in fact, the conspiracy itself. That is the smuggling of narcotics from the Virgin Islands to Atlanta by Benjamin and his cohorts. And basically the statement from Mr. Benjamin was that he had just sent 45 last week and he had his people in Atlanta. And that certainly was within the intrinsic to the conspiracy that had been charged in this particular case. With respect to the issue of the cross-examination of Mr. Bruce, and this goes along with also the argument of Mr. Hodge, the trial started and from the very beginning it was going to be staggered. That is because of medical issues on the part of Mr. Samuel. We tried to have the case one day, miss one day because of Mr. Samuel's medical issues, and then go back to trial the next day. Saturday was the third day of trial. It wasn't the second, as Mr. Hodge has indicated. It was the third day of trial. We started the trial, I believe it was on a Tuesday. We had the trial on Thursday. It was scheduled for trial on Saturday. At the conclusion prior to the trial starting, I advised defense counsel that corrections had to be made to Mr. Bruce's transcript. In hindsight, what I should have done is just go ahead and provide him with the uncorrected transcript until I received the corrected transcript. I'd have to go outside the record to explain to the court why the transcript had to be corrected because it's not in the moving papers. Nevertheless, the defendant, in addition to all the statements Mr. Bruce had made to law enforcement, all the recordings that Mr. Bruce was involved in with the consensual phone calls, all the reports from the agents concerning statements made by Mr. Bruce, the plea agreement reached to by Mr. Bruce with the District of Georgia with respect to his agreement, all that was provided long before trial, as well as the audio tapes, as well as the videotapes of the events in which Mr. Bruce was involved in. So to say that they had nothing to cross-examine Mr. Bruce with is incorrect. What they were missing was the actual grand jury transcript at that particular time. And we submit to the court that the defendant must show prejudice. It's not enough that he did the material as far as the transcript was delivered late, but then there's another step that must be shown. That is that they were prejudiced by his late production. And we submit to the court, contrary to Mr. Hodges' claim, that the trial took place two days after the transcript was received. That's incorrect. We had trial one day. The judge took additional testimony after he excused Mr. Bruce. And immediately the next day of trial, Mr. Bruce was called, even before the testimony of the witness who was just before him had been completed. He interrupted his testimony and put Mr. Bruce out immediately on that next day of trial. So we submit that there was no prejudice to the defendant with respect to the transcript. I believe that was the only issue that Mr. Hodges also indicates, that there was no testimony other than Mr. Bruce's testimony. And we disagree with that. You had an audio recording of Mr. Bruce obtaining the information from the audio recording of Mr. Samuel, obtaining the information from Mr. Bruce as to where the transaction is going to take place. The transaction had been moved from one hotel to another. The only people who knew where that transaction was going to take place were Mr. Samuel, Mr. Bruce, the agents, and Mr. Edwards. Mr. Samuel is heard and was identified by Mr. Bruce as the person he is speaking to in giving him the information as far as the address for the hotel where the transaction is going to take place. So contrary to Mr. Hodges' claim that there was no information other than from Mr. Bruce with respect to Mr. Samuel's involvement, Mr. Samuel himself is on audio tape getting information from Mr. Bruce as far as where the drug transaction is going to take place. Now with respect to Mr. Marrero, concerning the misstatement by Agent Grossman, two things. Mr. Marrero attempts to make Mr. Grossman as the person who had the crux of the government's case on his shoulder. And we submit to the court that is incorrect. Clearly, Mr. Bruce was the cog in this particular presentation. That is, Mr. Bruce was the one who identified the individuals who were involved, clearly identified Mr. Marrero as a person who, once Mr. Benjamin had provided him, had recruited him to conduct this transaction, this venture, that once he spoke to Mr. Benjamin and agreed to the venture to Mr. Benjamin, Mr. Marrero came back and provided him with the money for the airline tickets, instructed him that he should get a suitcase, a carry-on suitcase to hold the drugs, instructed him where to meet in the airport, that he would receive a phone call from either himself or from Mr. Benjamin with instructions as to when to go into the bathroom to collect the drugs. And also, if you recall, Mr. Bruce testified that he made three attempts on the first trip to go through with the smuggling venture. The first time, he decided he wasn't going to do it. He left the airport. He lost the value of the tickets, but he never told the airline. He just didn't get on the plane. He had checked in, but never got on the plane. He went back and told Mr. Benjamin and Mr. Marrero that he had not made the flight, and Mr. Marrero provided him with another $1,000 to purchase another airline ticket for the second time on the first trip to go to Atlanta. So contrary to the claim that Mr. Marrero did not know what was going on, Mr. Marrero was intricate in the smuggling venture. He provided instructions. He provided money. He provided the means by which it was going to take place. Now, with respect to Mr. Grossman, Mr. Grossman, I understand. Yes, I misstated, and the video was clear that Mr. Grossman had misstated that particular fact. But nevertheless, the fact remains that Mr. Marrero cannot claim he was not in the bathroom because Mr. Bruce himself said that as he went into the bathroom the first time, he didn't see anyone in the bathroom. So he came back out, was walking along the corridor between the Spirit Airlines Lounge and the American Airlines Lounge. When he's walking down, he sees Mr. Marrero walking back in the opposite direction. So he goes down and he turns around and comes right back up and goes into the bathroom. And this is corroborated by the video that was shown. Mr. Bruce is seen in the video. Mr. Marrero is seen in the video. Mr. Marrero is seen going into the bathroom. Mr. Bruce is seen going into the bathroom. Mr. Bruce is seen coming back out of the bathroom, and I asked him on direct examination, what did you have in your suitcase when you went into the bathroom? All I had in the suitcase was clothing. What did you have in your suitcase when you came out of the bathroom? I had clothing and I had the drugs. At that time, I was asking, where was Mr. Marrero? Mr. Marrero was still in the bathroom. You do not see Mr. Marrero leave the bathroom until after Mr. Bruce has already left the bathroom with the drugs. Going back to one other point with respect to Mr. Samuel, Attorney Hodge indicated that the court, when asked for a curative instruction concerning the fact that the transcript was late, Mr. Hodge made the claim that the court said that it would not want to raise a red flag about the Gummins case. That's not what the court said. The court didn't say anything about the Gummins case. What the court said, the court doesn't wish to raise a red flag, period. It didn't say anything about the Gummins case. So to cast aspersions upon the court as far as favoring the Gummins case versus that of the defense case is untrue. He said, basically, did not want to raise a red flag, period. Are there any other questions from the panel? Thank you, Mr. Jones. I noted that Mr. Hodge and Mr. Jean-Baptiste reserved time. Mr. Kattenfeld, I don't have a notation. Did you reserve? I'm sorry. I think I may have mentioned to the clerk I was just going to reserve one minute. Okay. I didn't get it. If you feel urgently that you need to do that, then that means take that minute. But if you don't feel a burning need to do it because you said you were going to do it, then we would certainly understand you're not doing it. But it's up to you. I think you just put the fire out. Okay. All right. Okay. All right. Mr. Hodge and Mr. Jean-Baptiste. Mr. Hodge first. Same thing. If you feel a burning desire here. I guess I do. Why am I not surprised? I just want to make it clear to the court. The government said that he went off the record to explain the nature of the correction. But he never went off the record. He said he had to. It wasn't on the record. And no one up here invited him to go off the record. And he never went off the record. Well, I thought he was talking about during the trial because I still have not heard. He's talking about today in order to explain the reason for what happened. And he said today he would have to go off the record because it's not on the record. At least that's how I interpreted it. And none of us apparently were too anxious to have him go off the record. Okay. Because I want to make it clear that to this date we still don't know what corrections had to be made, whether it was a change in Mr. Bruce's substantive testimony or whether it was typographical errors. Now, he stated that the trial didn't begin the Thursday. As I stated, it began the Tuesday. Yes, he's correct. But I'm still correct that Mr. Bruce testified a Tuesday, and it took more than 48 hours before he was cross-examined the Thursday. After Bruce testified, they weren't. I know we caught rebuttal, but this is really we can count the number of hours between Thursday and Saturday. We get that. Thank you. Well, I am just asking in closing that the court orders the case be remanded for an evidentiary hearing to determine what was the basis of the corrections that needed to be made and to give us that opportunity for a new trial to aggressively cross-examine Mr. Bruce the way we ought to have done the very first time around. Thank you. Thank you. Mr. Zambaptiste? Yes. Very briefly. I think the first question I was posed to me is, you know, do I know of a single case that the court has, you know, upheld, you know, dismissal of an indictment? And my answer is no. But when I take the test from mechanic and I apply it to this case, I think that, you know, this case meets, you know, the requirements of mechanic. And if it meets the requirements of mechanic, I don't think that it all goes away simply because there was a guilty verdict at the end of trial. And that's what I got from reading Justice Cano's concurrent opinion. I think unequivocally the violation here substantially influenced the grand jury's decision to indict. The government, on the other hand, the government is saying that, well, that was cured by the supersedent indictment. I say no because the government came back and the government basically said we're only here for forfeiture and nothing more. But then they tried to sneak in this testimony. So the jury, the grand jury never truly got to do their independent function because they basically were presented with falsehoods. And then for this corrected testimony, they're still giving misstatements. They're giving information about, you know, the storage locker and whatnot. So I don't think that, you know, it all goes away simply because the jury at the end of the day returned a verdict of guilty against Mr. Marrero. As such, I ask that the court, you know, find in the appellant's favor here and, you know, rule that the court erred in denying a motion to dismiss the indictment. Thank you very much, Mr. Mbattis.